UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHN T. TAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) 3:12 C 00119 |
| | ) Judge Marvin E. Aspen |
| SCIENCE APPLICATIONS | ) |
| INTERNATIONAL CORPORATION, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff John Taylor contends that his employer, Science Applications International Corporation ("SAIC"), failed to promote him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964. Presently before us is SAIC's motion for summary judgment. For the reasons set forth below, we grant the motion.[1]

### BACKGROUND[2]

SAIC is a scientific, engineering, and technology applications company. (Def.'s Facts ¶ 1.) SAIC began providing services at the Battle Command Training Center ("BCTC") at Fort Campbell, Kentucky in 2008 pursuant to the Warfighter Contract ("Contract"). Pursuant to the

---

[1] We deny SAIC's motion to strike Taylor's response brief, (Dkt. No. 21), which initially exceeded the twenty-page limit when filed in the Courier New font. (*See* Mot. to Strike ¶ 1; Mot. to Strike Resp. at 1–2.) When reformatted using the more common Times New Roman font, Taylor's response brief is less than twenty pages. (*See* Dkt. No. 29, Ex. 1.) Under these circumstances, we see no reason to strike or cut the opposition brief. We also grant Taylor's motion to substitute the reformatted response brief for the offending version (Dkt. No. 29).

[2] Unless otherwise noted, the facts described herein are undisputed and culled from SAIC's Local Rule 56.01(b) statement of facts and the parties' exhibits. Taylor declined to offer additional statements of fact in support of his opposition to the pending motion. Nonetheless, we will consider any material facts included in his brief where supported by record citations.

Contract, SAIC personnel trained military personnel on how to utilize certain systems. (*Id.* ¶¶ 1–2.)

Taylor began working for SAIC as a Simulation Support Technician on May 1, 2008.[3] In lay terms, Taylor trained soldiers on combat equipment and tactics using very expensive and sophisticated "video games." (*Id.* ¶ 2.) Taylor reported directly to Louis Sunstein, who reported to Watts. (*Id.* ¶ 3.) Taylor had worked in similar positions with other government contractors at the same facility for more than ten years. In those prior positions, he had not held a team leader or supervisory position. (*Id.* ¶ 2.)

Sunstein evaluated Taylor twice prior to the filing of this lawsuit. (*Id.* ¶ 4.) The first evaluation covered the period beginning with Taylor's hiring through March 21, 2009. This evaluation is critical of Taylor in certain categories, including his time management, reliance on other employees, and base of knowledge on the various simulation systems. (*Id.* & Taylor Dep. Ex. 4.) Taylor objected to Sunstein's assessment, which he felt was inaccurate and constituted retaliation for his disagreements with Sunstein. (Taylor Dep. at 47–55 & Ex. 4.) Taylor testified that he questioned Sunstein's leadership skills and told Sunstein as much. (Taylor Dep. at 48–49 ("I would tell him, you're a very poor leader.").) Taylor stated that he felt Sunstein hated him because he had a bachelor's degree and because Taylor is black.[4] (*Id.* at 51–55.) Taylor further

---

[3] The parties dispute whether R. Allen Watts, SAIC's Project Manager, decided to hire Taylor in 2008, or whether all employees from the previous contractor switched over together to work for SAIC without an individualized hiring or interviewing process. (Pl.'s Resp. to Def.s' Facts ¶ 3; Defs.' Facts, Ex. B, Taylor Dep. at 35–36.) We conclude that this dispute is immaterial for purposes of this motion, as we need not address the merits of SAIC's same-actor inference argument.

[4] Taylor also testified that Sunstein hated individuals who retired from the military with a higher rank than he obtained. (Taylor Dep. at 51.)

testified that although he felt Sunstein "showed" racism and did not like Taylor, Sunstein did not use racial epithets or make comments overtly indicating that his animosity stemmed from Taylor's race. (*Id.* at 52–56.) Taylor protested this 2009 evaluation to Watts, complaining that Sunstein provided no counseling or feedback all year.[5] (*Id.* at 59–61.) Taylor did not complain to Watts that he felt Sunstein's behavior was racially discriminatory. (*Id.* at 59–60.)

Sunstein evaluated Taylor again on March 2, 2010, covering the period February 1, 2009 through January 31, 2010. (Def.'s Facts ¶ 8.) In that evaluation, Sunstein commented that Taylor had made dedicated efforts to improving several skills and expanding his knowledge base. (Taylor Dep., Ex. 5.) Sunstein suggested that Taylor work on his office administrative skills, display a greater understanding of current infantry tactics, take online courses offered by SAIC, and become more involved with other, as well as updated, computer models. (*Id.*) Taylor testified that he felt this 2010 evaluation accurately described his performance at that time, while the 2009 evaluation reflected Sunstein's bias. (*Id.* ¶ 8; Taylor Dep. at 57–58.) Both evaluations rated Taylor with a "3" overall, on a scale of 1 through 5, indicating that he met SAIC's expectations. (Taylor Dep., Exs. 4–5.)

Later in 2010, two Team Leader positions became available. (Def.'s Facts ¶ 9.) Although Taylor applied for each position, he was not selected. (*Id.*; Taylor Dep. at 71.) In determining who to promote first as Team Leader, SAIC evaluated each candidate on a scale of 1 (limited) through 4 (expert) in the following categories: (1) Military Experience; (2) C-IED

---

[5] Taylor also testified that Sunstein was injured off the job within a few months of beginning work at SAIC and remained out of the office to recuperate for months. This injury might also explain why Taylor felt Sunstein provided insufficient feedback prior to the 2009 evaluation. (Taylor Dep. at 41–43.)

Experience; (3) Technical Expertise; (4) Teaching/Instructing; (5) Team Player; (6) Leadership; (7) Customer Service; (8) Effective Communicator; and (9) Education. (Def.'s Facts, Ex. C (Interview Results).) Based on the interview process, SAIC promoted David Graham, a Caucasian employee, for the first open Team Leader slot.[6] (Def.'s Facts ¶¶ 9–10.) Graham received 29 total points, while Taylor received 24. They achieved the same score in Military Experience, C-IED Experience and Education. Taylor rated higher than Graham in two areas (Technical Expertise and Teaching/Instruction), but rated lower in the Team Player and Effective Communicator categories. (*Id.*; Def.'s Facts, Ex. C.) Taylor received only one point for the Team Player factor and two points for the Effective Communicator factor, while Graham received four in each category. (Def.'s Facts ¶ 9 & Ex. C.) The parties do not dispute that Graham also had twenty years of military experience and eight years of experience in Army Training Systems Support in the private sector. (Def.'s Facts, Ex. C; *see also* Def.'s Facts, Ex. D (Hiring Justifications) and Ex. E (Graham Resume).)

Taylor contends that he should have received higher marks in this interview process, particularly in the Team Player category given his good reviews from Sunstein in that area. (Pl.'s Resp. to Def.'s Facts ¶ 9.) Taylor also testified that he had greater leadership abilities by virtue of his military service, whereas Graham's years of military experience did not include leadership training. (Taylor Dep. at 106–09 (stating that the selected candidates did not learn leadership in the military but only how to perform their particular tasks, i.e., flying aircraft, firing artillery).)

The second Team Leader spot went to Adam Williams, another white SAIC employee, in

---

[6] Graham was ranked second in the hiring process, but the first-choice candidate lacked SAIC's preferred educational qualifications. (Def.'s Facts ¶ 10.)

-4-

October 2010. (Def.'s Facts ¶ 11.) At the time he was selected Team Leader at Fort Campbell, Williams had been working in the exact same position since May 2009 at a BCTC at Fort Drum, New York. Williams already had been reporting to Watts while at Fort Drum. (*Id.*; *see* Def.'s Facts, Ex. D (Hiring Justifications) and Ex. F. (Williams Resume).) SAIC's hiring justifications document indicates that Williams was selected because of his Fort Drum Team Leader experience, which made him a "perfect fit," his interview performance, and his recommendation from the Fort Drum director. (Def.'s Facts, Ex. D (Hiring Justifications).) Williams' resume indicates that, at the time he sought the Fort Campbell position, he had approximately seven years of full-time active military service in various capacities plus two years' experience in battle simulation training in the private sector. (Def.'s Facts, Ex. F (Williams Resume).)

In addition to his assertion that he possessed superior leadership skills by virtue of his military career, Taylor contends that Graham and Williams were not qualified for the Team Leader positions because they lacked the requisite experience with simulators. (Def.'s Facts ¶ 12.) The job description for these positions indicated that SAIC required "six (6) years of related experience with a Bachelors degree or 10+ years of experience in lieu of a degree." (Taylor Dep., Exs. 6–7 (Requisition Profiles).) Taylor interprets this description to mean that SAIC desired candidates with at least six years of specific simulation experience. (Pl.'s Resp. to Def.'s Facts ¶ 12.)

In light of his concerns, Taylor contacted SAIC Human Resources in September and October of 2010. (Taylor Dep., Exs. 8–9.) In his September 21, 2010 email and follow-up, he expressed concern that two people from outside the Fort Campbell facility (Graham and Williams) received the Team Leader positions. He stated that he exceeded all of the job

prerequisites and generally questioned SAIC's hiring practices. (*Id.*, Ex. 8.) A few weeks later in October, Taylor prepared another letter where he expressed his opinion that SAIC's hiring practices were inappropriate and indicated that he would be filing a charge with the EEOC on November 5, 2010. (*Id.*, Ex. 9.) He did not inform Human Resources in either letter that he believed he was a victim of race discrimination. (Def.'s Facts ¶¶ 14–15.)

Taylor did not speak with Watts directly to ask about the details of his hiring decisions. (Taylor Dep. at 100–03.) Taylor also testified that he never heard Watts make any derogatory comments about African-Americans. (Def.'s Facts ¶ 17.) In a third memo prepared shortly before he went to the EEOC, however, he accused Watts of using Taylor's race as a reason to disqualify him from the Team Leader positions. (Def.'s Facts ¶ 16; Taylor Dep. at 96–101 & Ex. 10.) Taylor did not give that third, undated memo to anyone at SAIC. (Taylor Dep. at 97.) Taylor filed his charge with the EEOC on November 5, 2010, alleging race discrimination. (Taylor Dep., Ex. 11.)

## ANALYSIS

### I. MOTION TO STRIKE

Before addressing the merits of the summary judgment motion, we must first resolve SAIC's motion to strike the declaration of Mike Harrington, which Taylor submitted in support of his opposition. (Pl.'s Resp., Ex. 2.) SAIC contends that the Harrington declaration contains inadmissible speculation and hearsay and, moreover, does not comply with 28 U.S.C. § 1746. (Mot. to Strike ¶ 2; Mot. to Strike Reply at 2–3; *see also* MSJ Reply at 2–4.) Taylor argues that the Harrington declaration includes some admissible factual statements and substantially comports with the relevant statutory requirements. (Mot. to Strike Resp. at 2.)

Pursuant to 28 U.S.C. § 1746, litigants may submit declarations as evidence, instead of affidavits, "so long as those declarations are made under penalty of perjury, certified as true and correct, dated, and signed." *Worthy v. Mich. Bell Tel. Co.*, 472 F. App'x 342, 343 (6th Cir. 2012); *Counts v. Kraton Polymers*, 260 F. App'x 825, 829 (6th Cir. 2008); *Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994). The Sixth Circuit has repeatedly held that district courts should not consider declarations that are technically deficient. *Worthy*, 472 F. App'x at 344; *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010); *Bonds*, 20 F.3d at 702.

Here, the Harrington declaration is essentially a three-sentence cover letter, in which he vouches for the October 23, 2011 letter attached thereto, also written by him. (Pl.'s Resp., Ex. 2.) Harrington states that: (1) his declaration is made pursuant to 28 U.S.C. § 1746; (2) he is aware it may be filed in this court; (3) it is the "legal equivalent of a statement under oath;" and (4) the October 23, 2011 letter is based on his "own personal knowledge and belief." (*Id.* ¶¶ 1–2.) The declaration is signed and dated, as is the underlying letter, but Harrington does not certify that either document is true and correct. His declaration that he prepared the letter based on "personal knowledge" neither proves as much as an evidentiary matter, nor certifies truth as required by 28 U.S.C. § 1746. And while Harrington acknowledges that his statements are "equivalent" to those made under oath, he does not further assert that they are made under penalty of perjury. The declaration thus fails to comply with the express requirements of 28 U.S.C. § 1746 and is not competent evidence at the summary judgment stage. *Worthy*, 472 F. App'x at 344; *Harris*, 627 F.3d at 239 n.1; *Bonds*, 20 F.3d at 702. We grant SAIC's motion as to the Harrington declaration and will not consider this document when ruling on the pending motion.

## II. MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *see also DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (describing the issue as "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that on party must prevail as a matter of law") (internal quotation omitted). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006) (internal quotation omitted). In deciding whether summary judgment is appropriate, however, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513; *see Clayton v. Meijer, Inc.*, 281 F.3d 605, 609 (6th Cir. 2010).

### A. Prima Facie Case of Race Discrimination

Taylor proceeds with his disparate treatment claim of race discrimination using the indirect method of proof, as articulated first in *McDonnell Douglas Corporation v. Green*, 411

U.S. 792, 93 S. Ct. 1817 (1973). Under the indirect method, the plaintiff must establish a prima facie case of discrimination, which requires proof in this context that:

> (1) []he is a member of [a] protected class; (2) []he applied for and was qualified for a promotion; (3) []he was considered for and was denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812–13 (6th Cir. 2011); *Rodriguez-Monguio v. Ohio State Univ.*, No. 11-3185, 2012 WL 3871888, at *7 (6th Cir. Sept. 7, 2012); *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240–42 (6th Cir. 2005); *Cotton v. City of Franklin*, No. 09 C 215, 2010 WL 3521751, at * 9–10 (M.D. Tenn. Sept. 7, 2010). If these elements are established, discrimination is inferred and the burden of production shifts to the defendant to raise a legitimate, nondiscriminatory reason for the adverse action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 1093 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824; *DiCarlo*, 358 F.3d at 414–15; *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). Once a legitimate reason is offered, the inference of discrimination disappears, and the plaintiff must establish that the offered reason is a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle*, 474 F.3d at 317.

Here, the parties do not dispute that Taylor satisfies the first three prongs of the prima facie showing. He falls within a protected class, met the minimum requirements set by SAIC for the Team Leader position, applied for promotion to that position, and was denied the promotion. (*See* MSJ Mem. at 9 (focusing on the fourth element only when challenging Taylor's prima facie showing); MSJ Reply at 7 (reiterating that Taylor was qualified for the positions in question));

*see also* Taylor Dep., Ex. 8 (SAIC's email response indicating that Taylor met the minimum requirements but that a better qualified candidate was chosen).)

We turn then to address the remaining fourth element, which requires Taylor to "establish that []he and the non-protected person who ultimately was hired for the desired position had similar qualifications." *Provenzano*, 663 F.3d at 814 (quoting *White*, 429 F.3d at 242); *see also Williams v. Best Buy Stores, L.P.*, No. 07 C 294, 2008 WL 752639, at *4–5 (M.D. Tenn. Mar. 19, 2008). The *McDonnell Douglas* "prima facie showing is not intended to be onerous," *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008), and Taylor need not prove that he "had the exact same qualifications," *Provenzano*, 663 F.3d at 814, as Graham or Williams. *See also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000). Indeed, "[e]xact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury." *Moore v. City of Clarksville*, No. 10 C 141, 2011WL 2938759, at *6 (M.D. Tenn. July 19, 2011). In a failure to promote case, we must also be particularly careful not to conflate this fourth prong with the more in-depth pretext inquiry of the next stage of the *McDonnell Douglas* analysis. *Provenzano*, 663 F.3d at 814; *White*, 429 F.3d at 242; *Williams*, 2008 WL 752639, at *6–7. As such, "where qualifications are roughly similar, an employer's decision to select a given employee based on [his] qualifications might be a legitimate, non-discriminatory, non-pretextual basis from the challenged decision, but it would not automatically defeat the plaintiff's prima facie case." *Elgabi v. Toledo Area Reg'l Transit Auth.*, 228 F. App'x 537, 541 n.2 (6th Cir. 2007); *White*, 429 F.3d at 247 (Moore, J., concurring).

With these principles in mind, we compare the relative qualifications of Taylor with those

of Graham and Williams, setting aside SAIC's justifications and construing the evidence in Taylor's favor. *White*, 429 F.3d at 242–44 (explaining that some comparison will be necessary but that we may not rely on the defendant's reasoning at this stage). At the time Taylor applied for the Team Leader position, he had served in the military for twenty-six years and worked in the private sector for fourteen years as a simulations trainer. (MSJ Resp., Ex. 3 (Taylor Resume).) Graham had twenty years of military experience, as well as eight years of private sector experience where he managed training systems development. (Def.'s Facts, Ex. E (Graham Resume).) Williams had approximately seven years of full-time military service plus two years' experience in simulations training. When he applied for the position, Williams had been Virtual Training Chief at Fort Drum for more than a year, working under Watts. (Def.'s Facts, Ex. F (Williams Resume).) Williams and Graham were both working towards Master's degrees, in Leadership and Management, respectively. Taylor and Graham have roughly the same about of military experience, though Taylor disputes the value of Graham's leadership training while in the Army. Taylor also has more experience than either Graham or Williams in the private sector working with simulations, although Taylor had not held a supervisory position since his retirement from the military in 1997.

Bearing all of these credentials in mind, we conclude that Taylor has established that he had similar qualifications to both Graham and Williams when they all applied for the Team Leader positions. Although Taylor had not held leadership or management positions in his private sector work in this field, he had more years of experience overall than Graham and Williams. He also had many years of earlier military service where he held a supervisory role. Accordingly, we find that his qualifications are sufficiently similar to those selected as Team

Leaders to satisfy the relatively modest prima facie burden.[7]

B.  SAIC's Nondiscriminatory Reason and the Pretext Analysis

The burden of production shifts now to SAIC to prove that it had a legitimate, nondiscriminatory reason for its decision to hire Graham and Williams as Team Leaders instead of Taylor. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle,* 474 F.3d at 317. The parties do not dispute that SAIC has put forth such a reason, i.e., based on its selection processes, it concluded that Graham and Williams were better qualified to act as Team Leaders than Taylor. (*See* MSJ Resp. at 8 (declining to contest SAIC's explanation and jumping directly into the pretext analysis).) The record supports SAIC's assertion.

The pendulum swings back to Taylor, who must show that SAIC's justification is nothing but a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle,* 474 F.3d at 317. To demonstrate pretext and defeat summary judgment, Taylor must raise a question of fact about whether "the proferred reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Provenzano*, 663 F.3d at 815 (internal quotation omitted); *Manzer v. Diamond Shamrock Chems., Inc.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *Martin*, 548

---

[7] We reject Taylor's argument that Graham and Williams were unqualified for the Team Leader positions because they did not have six years of experience with simulators. (Def.'s Facts ¶ 2.) SAIC's Team Leader job postings required six years of "related experience." The job profiles did not, contrary to Taylor's interpretation, specify any particular amount of simulation experience or otherwise define "related experience." (Taylor Dep., Exs. 6–7 (Requisition Profiles).) Taylor has not presented any support for his narrow interpretation of the Team Leader prerequisites. In addition, Graham's resume indicates that he had eight years of experience in live, virtual and constructive training and considered himself a "subject matter expert in all phases of simulations and their applications to training." (Def.'s Facts, Ex. E (Graham Resume).) Even under Taylor's self-serving view of the job description, Graham met the posted requirements for the Team Leader position.

F.3d at 412.

Although Taylor attempts all three of these approaches separately, his primary, overarching argument—common in failure to promote cases—is that he was better qualified than Graham and Williams and should have been selected as Team Leader.[8] (MSJ Resp. at 11–16.) "Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Provenzano*, 663 F.3d at 815 (internal quotation omitted); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391–94 (6th Cir. 2009); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626–27 (6th Cir. 2006); *Cotton*, 2010 WL 3521751, at *12. The first question we address, then, is whether Taylor can be considered a plainly superior candidate to Graham and Williams.

1. **Relative Qualifications**

As discussed earlier, Taylor's qualifications are similar to the selected candidates. To further support his qualifications, Taylor takes issue with several scores he earned

---

[8] Taylor's "no basis in fact" argument is both unsupported and immaterial. Taylor contends that Sunstein's evaluations of him "were not accurate and given for an improper motive." (MSJ Resp. at 10.) Taylor has provided no evidence that Sunstein had an "improper motive" of any kind underlying these evaluations, beyond Taylor's own vague speculation. (Taylor Dep. at 47–55.) Taylor does not explain, furthermore, how any inaccuracies in the evaluations undermine SAIC's legitimate, non-discriminatory reason for not promoting Taylor. There is no evidence that SAIC relied on these evaluations to any particular degree when deciding who to promote. On the other hand, to the extent that SAIC felt Taylor's altercations with Sunstein reflected poorly on his candidacy, Taylor admitted in his deposition that he had such disagreements. He testified that he told Sunstein that he was a very poor leader. (*Id.* at 47–49.) Finally, Sunstein's termination by SAIC for unrelated dishonesty not does support Taylor's insinuation that the 2010 evaluation was false as well—particularly because Taylor testified that his 2010 evaluation was accurate. (*Id.* at 57–58.)

during the interview process.  SAIC provided a sheet identifying the candidates for the first Team Leader position, as well as their scores from the interview on nine different categories.  (Def.'s Facts, Ex. C.)  Taylor challenges his scores in the Team Player (1 out of 4), Customer Service (1 out of 4), and Leadership (3 out of 4) categories.  (MSJ Resp. at 11–14.)  Taylor contends that he deserved a score of 4 out of 4 in leadership skills due to his many years in supervisory roles in the military.  As Taylor also points out, Sunstein gave him favorable marks on his evaluations as being a team player.  Sunstein also never identified any problems with Taylor's customer service.

The record does not indicate how the interviews unfolded or why Taylor received these particular scores in the different categories.  We will not speculate.  Regardless, this lapse in the record does not create a genuine question as to Taylor's qualifications vis-à-vis Graham.  Even poking holes in SAIC's interview assessment[9] and disputing the value of Graham's military record, Taylor cannot show that he was "so significantly better than [Graham] that no reasonable employer would have chosen" Graham over Taylor.  *Bender*, 455 F.3d at 627.  For example, if

---

[9] Taylor argued that we should not rely on SAIC's unsworn documentary evidence, including the interview score sheet and hiring justifications chart.  (MSJ Resp. at 13–14.)  Rule 56(c)(1)(A) authorizes the parties to submit "depositions, documents, electronically stored information, affidavits or declarations . . . or other materials" to support their factual assertions at the summary judgment stage.  *See Brumlage v. Wells Fargo Home Mortgage, Inc.*, 114 F. App'x 489, 494 (6th Cir. 2005) ("Courts regularly consider a variety of documents, including documents outside the types of evidence specifically listed in Rule 56(c), in ruling upon a summary judgment motion.").  Generally speaking, we may consider unsworn documentary evidence so long as the evidence would be admissible if submitted in a proper form at trial.  *See* Fed. R. Civ P. 56(c)(1)(B).  The Sixth Circuit has emphasized, however, that "unauthenticated documents do not meet the requirements" of Rule 56.  *Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).  In light of Taylor's concerns and Sixth Circuit precedent, we ordered SAIC to submit a declaration or declarations authenticating its exhibits, particularly exhibits C through F.  (*See* Dkt. No. 31, 3/22/13 Order.)  SAIC did so on March 29, 2013, (Dkt. No. 36, Lovering Decl.), and Taylor has not objected to that declaration.  Nor has Taylor suggested that SAIC's materials are unauthentic or could not be admissible at trial.  We thus may rely on SAIC's exhibits for purposes of this motion.

we credit Taylor additional points in the three disputed categories, he is still comparable to Graham. Assuming that Taylor deserved a 4 in Team Player, Customer Service, and Leadership, as he claims, his total score would have increased to 31. He and Graham would have been the two front runners in that event, with Taylor two points ahead instead of five points behind Graham. But such a result would hardly prove that Taylor was vastly better qualified than Graham.

SAIC apparently did not use the same process and matrix when it selected Williams, but SAIC's hiring justifications document indicates that he was chosen because he was a proven Team Leader at another BCTC location at Fort Drum. (Def.'s Facts, Ex. D (Hiring Justifications).) Williams had served in that role for more than a year and reported to Watts, who was responsible for the Fort Campbell Team Leader decisions. According to SAIC's notes, the Fort Drum director highly recommended Williams, who was a "perfect fit for assuming the same duties" at Fort Campbell. (*Id.*) Regardless of his many years of experience in the Army and as a simulations trainer, Taylor cannot show that he was a clearly superior candidate to Williams, who was already performing the Team Leader job with success. We cannot hold on these facts that no reasonable employer could have selected Williams over Taylor under these circumstances.

Taylor's pretext argument also overlooks a valid reason why SAIC rationally could have preferred—and apparently did prefer—Graham and Williams to Taylor, even if they otherwise were evenly-matched candidates. (*See* MSJ Mem. at 10; MSJ Reply at 8.) Taylor insists that he possessed greater leadership skills because of his military duties, (Taylor Dep. at 106–09), but ignores the glaring and undisputed fact that he had not held a supervisory role since retiring from the Army in 1997. Taylor had no managerial or supervisory experience in the thirteen years he

spent in the private sector prior to posting for the Team Leader positions at issue in 2010. (Def.'s Facts ¶ 2.) As discussed earlier, Graham and Williams both had recent and ongoing supervisory experience in the simulations industry. Although their careers are shorter, and their technical skills perhaps weaker than Taylor's,[10] both possessed relevant managerial skills that Taylor lacked. With that in mind, and weighing the candidates' credentials overall, we simply cannot conclude that Taylor "was a plainly superior candidate, such that no reasonable employer would have" reached SAIC's decision. *Provenzano*, 663 F.3d at 815; *see Bender*, 455 F.3d at 626–27 ("If two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the other's."); *Cotton*, 2010 WL 3521751, at *12.

### 2. Other Probative Evidence of Discrimination

Though not a plainly superior candidate, Taylor was nonetheless a qualified candidate and can withstand summary judgment by introducing other probative evidence of discrimination. *Provenzano*, 663 F.3d at 816 (internal quotation omitted); *Risch*, 581 F.3d at 392; *Bender*, 455 F.3d at 626–27 (explaining that this additional evidence is needed in cases where qualifications evidence is not sufficiently significant "itself to call into question the honesty of the employer's explanation"); *Cotton*, 2010 WL 3521751, at *12. Taylor has failed to do so, however.[11]

---

[10] Graham, for example, was rated 1 out of 4 in the Technical Expertise interview category, while Taylor received a rating of 3 out of 4. (Def.'s Facts, Ex. C.)

[11] We also cannot agree with Taylor that he has shown pretext by exposing SAIC's alleged failure to abide by its own affirmative action policy, pursuant to which he claims SAIC should have given him preference in the hiring decision. Taylor does not fully articulate this argument. He does not identify what preference SAIC should have given him pursuant to its policy. (MSJ Resp. at 10, 15.) Nor can he, because the portion of the SAIC policy he submitted does not state that candidates who served during the Vietnam era will be promoted over other

Taylor testified that he did not hear Sunstein or Watts—the decisionmaker—make any racially derogatory comments. (Taylor Dep. at 52–56, 109–10.) Although he stated that Sunstein did not like him, Taylor provided no specific examples of conduct by Sunstein that could permit an inference of discrimination. (*Id.* at 52–56.) Taylor also testified that he believed Watts' decision was racially discriminatory because he felt he was better qualified than Graham and Williams, who are white. (*Id.* at 109–10.) Taylor offered no other examples of discrimination. (*See id.* at 112–13.) Additionally, while he plainly questioned SAIC's practices, Taylor never complained to anyone at SAIC that he felt the Team Leader selections were racially discriminatory. (*Id.* at 59–60 (disputing his 2009 evaluation to Watts but not alleging discrimination); Taylor Dep. Exs. 8–9 (corresponding to SAIC human resources but not alleging race discrimination); Def.'s Facts ¶¶ 14–15.) In the absence of any probative evidence of discrimination, Taylor cannot show that SAIC's legitimate explanation for its promotion decisions is pretextual.[12] Accordingly, SAIC is entitled to summary judgment.

---

qualified candidates, or that they will be afforded any specific advantage in the selection process. (MSJ Resp., Ex. 7 (Dkt. No. 21-7) at 13–16 (Staffing Policy).) Section 4.2.5 of the policy states that SAIC "takes affirmative action to employ and promote the disabled and veterans of the Vietnam era." (*Id.* at 16.) It further provides that SAIC will post positions with local or state jobs postings systems in an apparent effort to reach and recruit such veterans. It does not, however, support Taylor's implication that he should have been selected over Graham and Williams because of his Vietnam veteran status. In short, Taylor cannot show that SAIC should have taken any particular action pursuant to this policy or, accordingly, that it failed to do so.

[12] We add that Harrington's declaration, had we considered it, would not have helped Taylor clear this hurdle. Although Harrington plainly deems Sunstein to be racist, his October 23, 2011 letter does not describe any specific conduct by Sunstein or Watts that might permit a factfinder to infer unlawful discrimination. Additionally, most of Harrington's narrative is either conjecture or hearsay, as it does not appear to be based on his own personal knowledge. (Pl.'s Resp., Ex. 2.)

# CONCLUSION

As indicated earlier, we grant SAIC's motion to strike the declaration of Mike Harrington but deny its motion to strike Taylor's response brief (Dkt. No. 26). We also grant Taylor's motion to substitute his reformatted response brief (Dkt. No. 29) for the version initially filed. Finally, for the reasons set forth above, we grant SAIC's motion for summary judgment.

This matter is dismissed in its entirety. The Clerk is directed to enter judgment in this case in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED:

Marvin E. Aspen
United States District Judge

Dated:       Chicago, Illinois
               April 22, 2013